United States District Court

For the Northern District of California

1

2

3          UNITED STATES DISTRICT COURT

4          NORTHERN DISTRICT OF CALIFORNIA

5

6

7   DAVID GLENN BROWN,

8          Plaintiff,                          No. C 12-1923 PJH

9          v.                                  **ORDER GRANTING MOTION
                                                TO DISMISS**
10  CONTRA COSTA COUNTY, et al.,

11         Defendants.

                                   /
12

13         Before the court is defendants' motion to dismiss the complaint for failure to state a

14  claim.  Having read the parties' papers and carefully considered their arguments, and good

15  cause appearing, the court hereby GRANTS the motion as follows.

16                              **BACKGROUND**

17         This is a case alleging discrimination and hostile work environment, filed by plaintiff

18  David Glenn Brown.  Defendants are Contra Costa County; Mark Peterson ("Peterson"),

19  the elected District Attorney of Contra Costa County; and two Contra Costa County Deputy

20  District Attorneys – Karen Zelis Holder ("Holder"), and Douglas C. MacMaster

21  ("MacMaster").

22         Plaintiff, who is African-American, was employed as a Deputy District Attorney for

23  Contra Costa County beginning in July 1986, and continuing until the date he asserts he

24  was constructively discharged.  In the first amended complaint ("FAC"), plaintiff alleges that

25  over the years he performed his job well, and received numerous promotions.

26         From March 2004 until January 2011, plaintiff was the Senior Deputy District

27  Attorney in charge of the Richmond Branch of the Contra Costa County District Attorney's

28  Office ("D.A.'s Office").  According to plaintiff, running a branch office is considered

United States District Court

For the Northern District of California

1   "prestigious," but "difficult."  FAC ¶ 14.  Plaintiff asserts that his ascension to the top ranks

2   of the D.A.'s Office was not without difficulty, because "[i]t is well-known that there is an

3   undercurrent of racism in the criminal justice system, and Contra Costa County has been

4   considered by some as exemplary of that bias."  FAC ¶ 15.  He claims that some people

5   refer to Contra Costa County as "KKK County."  Id.  He also alleges that he "has long been

6   aware that some in the criminal justice community are biased against him because of his

7   race," but asserts that "until recently, he had always been able to overcome these

8   prejudices through his abilities and achievements."  Id.

9        Plaintiff recounts two incidents that occurred at the D.A.'s Office that reflect this

10  allegedly racist environment.  In the first incident, which occurred in 2002, MacMaster

11  allegedly interrupted a conversation between plaintiff and a co-worker by stating, "Brown

12  [referring to plaintiff] would be asking 'where da white women at?'" in an exaggerated

13  "ghetto accent."  Plaintiff asserts that he filed a complaint against MacMaster for this

14  inappropriate remark, and believes that MacMaster "holds a grudge" against him for this.

15  FAC ¶¶ 16, 18.  In the second incident, plaintiff alleges on "information and belief" that

16  Holder (who is herself African-American) instructed junior attorneys in a training session to

17  kick off African American jurors and to commit other unethical acts in presenting a case.

18  FAC ¶ 17.

19       In 2010, there was an election for District Attorney of Contra Costa County.  The

20  candidates were defendant Peterson, and a private attorney named Dan O'Malley.  Plaintiff

21  supported Dan O'Malley and contributed to his campaign.  FAC ¶¶ 20-21.  Holder and

22  MacMaster supported Peterson.  FAC ¶ 22.  Plaintiff asserts that the election was "hotly

23  contested," and that the Peterson supporters in the D.A.'s Office took the position that it

24  was "disloyal" to support an "outsider" like O'Malley, to the extent that one Peterson

25  supporter – Harold Jewett – allegedly punched an O'Malley supporter in the eye, causing

26  severe damage.  FAC ¶ 21.

27       Plaintiff also asserts that Holder and MacMaster "made it clear during the months

28  prior to the election that anyone who did not back [Peterson] would suffer if Peterson was

2

United States District Court
For the Northern District of California

1  elected." FAC ¶ 22.  According to plaintiff, Holder made statements to the effect that she

2  wanted to be present after the election to watch Peterson demote plaintiff.  FAC ¶ 23.

3         Plaintiff alleges that as a result of these "threats," he became concerned about his

4  future employment with the D.A.'s Office, and began to scale back his financial support of

5  O'Malley (even though he believed O'Malley was the better candidate).  However, he did

6  not actually switch his allegiance to Peterson.  FAC ¶ 24.

7         Peterson won the election in November 2010.  Plaintiff alleges that in December

8  2011,[1] Peterson demoted him "in a gratuitously humiliating and degrading fashion."  Plaintiff

9  asserts that while no reason was given for the demotion, "it was clearly in retaliation for

10  [his] exercise of his First Amendment rights to support the candidate of his choice."  FAC ¶

11  25.  Moreover, plaintiff alleges, Peterson "invited Holder to watch as [p]laintiff was

12  demoted" – despite the fact that Holder was not a supervisor and therefore had no reason

13  to be there – "thus making good on Holder's pre-election desire."  Id.  He does not provide

14  any specific details of this alleged demotion, or what he means by asserting that Peterson

15  "invited Holder to watch" – but he is apparently referring to the fact that Peterson removed

16  him from the position of Senior Deputy District Attorney in charged of running the Richmond

17  Branch of the D.A.'s Office.

18         Following this "demotion," plaintiff was assigned to work in the Mental Health Unit, a

19  position that plaintiff claims is "isolated" and "only quasi-criminal," and is considered "a post

20  in 'Siberia' for attorneys who are being punished."  FAC ¶ 26.  Plaintiff alleges that when he

21  arrived at the Mental Health Unit, he discovered that it was totally disorganized and "in

22  complete disarray."  FAC ¶ 27.  Tom Kensok, the Deputy who had previously been in

23  charge of the Mental Health Unit, had been a Peterson supporter, and was transferred from

24  the Unit to become a Senior Deputy District Attorney and Peterson's "right-hand man."  Id.

25  Plaintiff then proceeded to begin trying to "straighten[ ] out the legal mess" that Kensok had

26  allegedly left behind.  FAC ¶ 28.

27

28         [1]  The court assumes that plaintiff intended to say "December 2010."

United States District Court

For the Northern District of California

1  Plaintiff asserts that in March of 2011, while he was working in the Mental Health

2  Unit, MacMaster (now a Senior Deputy District Attorney and Peterson's Chief Deputy) sent

3  an e-mail to a third party stating that he was "amazed" that plaintiff was able to do simple

4  legal research.  Plaintiff claims that "[i]n view of the animus previously expressed by

5  MacMaster," he "believed that a hostile work environment was being created."  Accordingly,

6  he complained to Peterson.  FAC ¶ 29.

7  Plaintiff asserts that Peterson responded by appointing MacMaster's best friend in

8  the office to investigate the complaint, and that "[i]t goes without saying that nothing came

9  of the investigation."  FAC ¶ 30.

10  Next, plaintiff alleges, just as he was beginning to achieve some success with

11  matters in the Mental Health Unit, Peterson transferred him to the Juvenile Unit, to a non-

12  supervisory position.  According to plaintiff, this position offered no possibility of trial work,

13  and was one that was generally held by inexperienced, junior attorneys.  FAC ¶ 31.

14  According to plaintiff, Peterson's "retaliation plan" was now nearly complete – in six months,

15  plaintiff had gone from serving as a Senior Deputy District Attorney running a significant

16  branch office, to serving in a position typically held by a first- or second-year attorney.  Id.

17  Plaintiff asserts that MacMaster told him that the reason for this latest transfer was

18  that plaintiff was "unhappy in the mental health assignment," which (according to plaintiff)

19  MacMaster knew was a false and pretextual statement.  In fact, plaintiff asserts, he had

20  been enjoying recent success in the Mental Health Unit and had been attending training to

21  learn the "specialized quasi-criminal aspects of the law with respect to mental health

22  cases," and had completely turned the office around, eliminating the "disarray."  FAC ¶ 32.

23  Plaintiff alleges that to make matters worse, a junior attorney was told she would

24  have to go to the Juvenile Unit because plaintiff would not take the position seriously.  FAC

25  ¶ 33. Plaintiff asserts further that in June 2011, he was speaking with a junior co-worker

26  when he was approached by now-Senior Deputy District Attorney Harold Jewett (the

27  person who had punched the O'Malley supporter prior to the election) who told the junior

28  attorney, "Don't listen to anything he (plaintiff) has to say."  FAC ¶ 34.

4

United States District Court

For the Northern District of California

1    Plaintiff asserts that on July 11, 2011, the day before beginning his assignment in

2    the Juvenile Unit, he requested a meeting with Dan Cabral, the supervisor in charge of the

3    Unit and someone that plaintiff had considered a long-time friend.  FAC ¶ 35.  At the

4    meeting, Cabral said that his supervisors had warned him about plaintiff, although he would

5    not repeat what he had been told (claiming that he did not recall).  Plaintiff told Cabral he

6    did not like being lied to, and left the meeting.  FAC ¶ 36.

7    Plaintiff was then summoned to a meeting with MacMaster.  At that meeting,

8    according to plaintiff, MacMaster and Cabral accused him of being insubordinate and

9    unprofessional for walking out of the earlier meeting with Cabral, and demanded that he

10   sign a disciplinary letter.  When plaintiff refused to do so, they allegedly told him he was not

11   free to leave, and then accused him of failing to attend another meeting, which plaintiff

12   claims he had in fact attended.  Plaintiff asserts that "[i]t became clear to [him] that he was

13   being set up for termination" and that Peterson, MacMaster, and others were "willing to lie

14   in order to manufacture 'grounds' to do so."  FAC ¶ 37.

15   Following these events, plaintiff asserts, he "was forced to take time off from work,"

16   and he "subsequently went out on stress leave and has not returned."  Nevertheless,

17   plaintiff claims, "the pattern of harassing conduct continued."  FAC ¶ 38.

18   In December 2011, a clerk that plaintiff had formerly supervised at the Richmond

19   Office asked him to testify on her behalf at a Merit Board Hearing.  However, Holder

20   allegedly "announced to the tribunal" that plaintiff should not be permitted to testify, by

21   revealing that he was out on sick leave – which plaintiff claims was a violation of County

22   policy.  FAC ¶ 38.  Plaintiff also claims that Holder said that plaintiff had a lawsuit pending

23   against the County, which plaintiff asserts was not true.  Id.[2]

24   Plaintiff filed the original complaint in this action on April 18, 2012, using one of the

25   court's Title VII form complaints.  At that time he alleged unlawful termination, and the

26   following:

27

28       [2] Plaintiff also alleges, however, that he had filed an administrative charge with the
EEOC in September 2011.  See FAC ¶ 40.

5

1    Ongoing pattern of harassment and retaliation making it impossible to perform
     my job duties.  Making disparaging remarks about my job performance and
2    ability.  Making false statements about my job performance to those in and
     outside the office.  Demoting and transferring [p]laintiff for political personal
3    and discriminatory purpose.

4    Plaintiff asserted that the conduct of defendants was discriminatory with respect to his race

5    or color, and as to "political conduct."

6          He also alleged that he had received a right-to-sue letter from the EEOC on

7    February 12, 2012.  However, the EEOC letter that was attached to the complaint was

8    dated February 23, 2012, and stated that the Commission had received plaintiff's request

9    for a right-to-sue letter, and that it had terminated the investigation and forwarded plaintiff's

10   request to the DOJ for issuance.  No actual right-to-sue letter was attached.  Thus, the

11   clerk issued a deficiency notice, indicating that plaintiff needed to submit the notice of right

12   to sue.  The EEOC did issue a right-to-sue letter on April 18, 2012, and plaintiff presumably

13   received it shortly after that date.

14         In May 2012, plaintiff allegedly had a face-to-face meeting with Peterson, to discuss

15   his future with the D.A.'s Office.  Plaintiff alleges that he asked to be placed on paid

16   administrative leave, as that was how Peterson had handled the case of another attorney in

17   the office who had been "undeniably confronted with a hostile work environment."

18   However, Peterson allegedly denied the request on the basis that plaintiff was already on

19   medical leave.  FAC ¶ 39.

20         On May 16, 2012, plaintiff submitted an "amended complaint" with a copy of the

21   right-to-sue letter (dated April 18, 2012) attached.  This "amended complaint" asserted

22   claims under Title VII; 42 U.S.C. §§ 1983 and 1981; and the Americans With Disabilities

23   Act, 42 U.S.C. § 12101, et seq.  This "amended complaint" was stamped "received" by the

24   Clerk's Office, but was not filed.

25         On May 21, 2012, plaintiff filed another "amended complaint," to which he also

26   attached a copy of the April 18, 2012 right-to-sue letter.  On June 11, 2012, Magistrate

27   Judge Corley, to whom the case was then assigned, issued an order indicating that since

28   Rule 15 authorizes a plaintiff to file only one amended complaint as of right, the court would

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  disregard the May 16, 2012 "amended complaint" and would authorize the filing of the more

2  recent May 21, 2012 "amended complaint."  For this reason, this order refers to the May

3  21, 2012 "amended complaint" as the "first amended complaint" or "FAC."

4      Plaintiff asserts four causes of action in the FAC.  In the first cause of action, plaintiff

5  alleges "racial discrimination" in violation of 42 U.S.C. § 1981 and § 1983, against the

6  individual defendants.  He also mentions the right to "work in a workplace free from racial

7  harassment, hostile work environment, racial discrimination and retaliation," FAC

8  ¶ 42, but it is not clear whether he is asserting all those as bases for the claim.  He then

9  asserts that the individual defendants deprived him of his "rights, privileges and immunities

10  secured to him by the Constitution and the laws of the United States, including . . . the right

11  to be free from workplace discrimination and equal protection provided by the Fourteenth

12  Amendment in violation of 42 U.S.C. §§ 1981 and1983."  FAC ¶ 43.

13      In the second cause of action, plaintiff alleges a violation of the First Amendment to

14  the United States Constitution, against all defendants.  Plaintiff asserts that he has the right

15  under the U.S. Constitution "to support any candidate he prefers, without fear of workplace

16  retaliation should that candidate lose the election; and that "[d]efendants' systematic

17  harassment and creation of a hostile work environment was intended to chill [his] exercise

18  of his First Amendment rights, and retaliate against him for exercise of those rights."  FAC

19  ¶¶ 46, 47.

20      In the third cause of action, plaintiff alleges a violation of the Fourteenth Amendment

21  to the United States Constitution, against all defendants.  This appears to be a Fourteenth

22  Amendment Equal Protection claim, except that plaintiff does not mention § 1983.  Plaintiff

23  alleges that defendants' treatment of him "in a discriminatory manner is in violation of [his]

24  fundamental constitutional rights."  FAC ¶ 51.

25      In the fourth cause of action, plaintiff asserts a claim of "unconstitutional policy and

26  practice," in violation of 42 U.S.C. §§ 1983, 1986, and the Fourteenth Amendment, against

27  Contra Costa County only.  Here, plaintiff alleges that the County is liable because the

28  actions of the individual defendants were caused by customs or policies of the District

United States District Court
For the Northern District of California

1   Attorney's Office; were caused by deliberate indifference of the District Attorney's Office;

2   and/or were ratified by the final decision-makers of the District Attorney's Office.  FAC ¶ 54.

3        Defendants now seek an order dismissing the FAC pursuant to Federal Rule of Civil

4   Procedure Rule 12(b)(6) for failure to state a claim.

5                                    **DISCUSSION**

6   A.    Legal Standard

7        A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal

8   sufficiency of the claims alleged in the complaint.  Ileto v. Glock, Inc., 349 F.3d 1191,

9   1199-1200 (9th Cir. 2003).  Review is limited to the contents of the complaint.  Allarcom

10  Pay Television, Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995).  To survive

11  a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the

12  minimal notice pleading requirements of Federal Rule of Civil Procedure 8, which requires

13  that a complaint include a "short and plain statement of the claim showing that the pleader

14  is entitled to relief." Fed. R. Civ. P. 8(a)(2).

15       A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the

16  plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support

17  a cognizable legal theory.  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

18  1990).  The court is to "accept all factual allegations in the complaint as true and construe

19  the pleadings in the light most favorable to the nonmoving party."  Outdoor Media Group,

20  Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007).  However, legally

21  conclusory statements, not supported by actual factual allegations, need not be accepted.

22  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).  The allegations in the complaint "must be

23  enough to raise a right to relief above the speculative level."  Bell Atlantic Corp. v.

24  Twombly, 550 U.S. 544, 555 (2007) (citations and quotations omitted).

25       A motion to dismiss should be granted if the complaint does not proffer enough facts

26  to state a claim for relief that is plausible on its face.  See id. at 558-59.  A claim has facial

27  plausibility when the plaintiff pleads factual content that allows the court to draw the

28  reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556

United States District Court
For the Northern District of California

1  U.S. at 678 (citation omitted).  "[W]here the well-pleaded facts do not permit the court to

2  infer more than the mere possibility of misconduct, the complaint has alleged – but it has

3  not 'show[n]' – 'that the pleader is entitled to relief.'"  Id. at 679.  In the event dismissal is

4  warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved

5  by any amendment.  See Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

6  B.      Defendants' Motion

7          Defendants argue that all four causes of action should be dismissed for failure to

8  state a claim.  Defendants first list a number of allegations in the FAC, and assert that the

9  statements should be disregarded under Twombly/Iqbal because they are conclusory.  The

10  court construes this argument as part of the general argument that plaintiff has failed to

11  plead facts sufficient to support any of the four causes of action alleged in the complaint,

12  which is addressed below.

13          In general, one of the more problematic aspects of the FAC is that it sets forth a

14  series of "Factual Allegations," and follows this section with four bare-bones causes of

15  action, none of which clearly connects the previously alleged factual allegations to the

16  required elements of the claims.  In order to state a plausible claim, plaintiff must at a

17  minimum indicate the facts that support each of those necessary elements.

18          1.      Claims of racial discrimination, harassment, and retaliation under § 1981, and

19                  equal protection violations under § 1983

20          In the first cause of action, plaintiff alleges a claim of racial discrimination under 42

21  U.S.C. § 1981 and § 1983, against the individual defendants.  In addition to discrimination,

22  plaintiff also references racial harassment, hostile work environment, and retaliation.

23  Defendants assert that none of the allegations are sufficient to state a claim.

24          Section 1981 guarantees "all persons" the right to "make and enforce contracts."

25  Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1122 (9th Cir. 2008) (quoting 42

26  U.S.C. § 1981(a)).  To state a claim of discrimination under § 1981, a plaintiff must identify

27  an impaired "contractual relation," by showing that intentional racial discrimination

28  prevented the creation of a contractual relationship or impaired an existing contractual

9

United States District Court

For the Northern District of California

1 relationship.  Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006).  Making and

2 enforcing contracts includes the "making, performance, modification, and termination of

3 contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the

4 contractual relationship."  42 U.S.C. § 1981(b).

5       In the context of employment discrimination, individuals can be personally liable

6 under § 1981 even if the actual employer is not liable.  See, e.g., Al-Khazraji v. Saint

7 Francis Coll., 784 F.2d 505, 518 (3rd Cir. 1986); El-Hakem v. BJY Inc., 262 F.Supp.2d

8 1139, 1147 (D. Or. 2003), aff'd, 415 F.3d 1068 (9th Cir. 2005).  However, § 1981 covers

9 only discriminatory conduct based on race or ethnicity.  Johnson, 534 F.3d at 1123.

10 Furthermore, stating a claim under § 1981 requires allegations of intentional discrimination.

11 Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 390-91 (1982).

12      Section 1981 also encompasses employment-related retaliation claims.  CBOCS

13 West, Inc. v. Humphries, 553 U.S. 442, 452-57 (2008); Johnson v. Lucent Techs., Inc., 653

14 F.3d 1000, 1006 (9th Cir. 2011).  As with Title VII and other employment-related claims,[3]

15 plaintiff must allege facts showing that he engaged in an activity protected by the statute,

16 and that he suffered an adverse employment action because he engaged in that activity.

17 See, e.g., Stegall v. Citadel Broad. Co., 350 F.3d 1061, 1065-66 (9th Cir. 2003).

18      Finally, in order to state a claim for workplace harassment or hostile work

19 environment, a plaintiff must allege facts indicating that he was subjected to unwelcome

20 verbal or physical conduct; and that the conduct was sufficiently severe or pervasive to

21 alter the conditions of his employment and create an abusive working environment.  See,

22 e.g., Vasquez v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003); Manatt v. Bank

23 of America, NA, 339 F.3d 792, 798 (9th Cir. 2003); see also Harris v. Forklift Sys., Inc., 510

24 U.S. 17, 21-22 (1993) (conduct must be sufficiently severe or pervasive in order to create

25 an objectively hostile or abusive work environment); Meritor Sav. Bank v. Vinson, 477 U.S.

26

27      [3] The analysis of a § 1981 employment discrimination claim follows the same legal
28 principles as a Title VII racial discrimination claim.  Metoyer v. Chassman, 504 F.3d 919, 930
(9th Cir. 2007).

United States District Court
For the Northern District of California

1  57, 67 (1986) (verbal comment or physical conduct must affect the terms, conditions, or

2  privileges of employment).

3      In addition, occasional or isolated incidents are not actionable, and a plaintiff must

4  show a concerted pattern of harassment of a repeated, routine, or generalized nature.

5  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  In his opposition, plaintiff

6  appears to be asserting that the harassment claim is valid on a "continuing violation"

7  theory.  In the Ninth Circuit, the continuing violations doctrine applies to claims pursuant to

8  42 U.S.C. sections 1981 and 1983 in the same manner as the doctrine applies to claims

9  pursuant to Title VII – the doctrine is applicable to hostile work environment claims

10  involving related acts that collectively constitute a single unlawful employment practice, but

11  inapplicable to claims for discrete acts of discrimination and retaliation.  Leland v. City &

12  County of San Francisco, 576 F.Supp.2d 1079, 1093 (N.D. Cal. 2008) (citing Nat'l R.R.

13  Passenger Corp. v. Morgan, 536 U.S. 101 (2002)).

14      Here, however, because of the deficiencies in the pleading, it is not clear whether

15  the continuing violations doctrine can save plaintiff's claims, given that he alleges incidents

16  that occurred as many as ten years ago.  Because the FAC does not connect any facts to

17  the elements required to state a claim under theories of discrimination, retaliation, and

18  harassment, it is difficult to determine the basis for the § 1981 claims.  In addition, there are

19  no facts pled that show defendants were motivated by any racial animus, apart from the

20  vague and conclusory allegations regarding the "undercurrent of racism in the criminal

21  justice system."  FAC ¶ 15.  Accordingly, the motion is GRANTED as to the § 1981 claims.

22  The dismissal is with leave to amend to allege facts sufficient to support the elements of the

23  claims.

24      Finally, with regard to the § 1983 claim for violation of the Equal Protection Clause,

25  this claim appears indistinguishable from the third cause of action, discussed below.

26  Accordingly, the court treats the first cause of action as alleging only a § 1981 claim, and

27  analyzes the sufficiency of the § 1983 allegations in its discussion of the third cause of

28  action.

United States District Court

For the Northern District of California

1          2.      First Amendment claim

2          In the second cause of action, plaintiff alleges that his "demotion" to the Mental

3    Health Unit and transfer to the Juvenile Unit by Peterson violated his First Amendment

4    rights, because Peterson took those actions in retaliation for plaintiff's having supported

5    another candidate in the election for District Attorney.

6          Under Elrod v. Burns, 427 U.S. 347 (1976), a public official who is a "policymaker"

7    can be fired for political reasons without offending the United States Constitution.  While

8    there is not a clear line between policymaking and non-policymaking positions, part of the

9    consideration involves whether the employee "acts as an advisor or formulates plans for

10   implementation of broad goals."  Id. at 368.  The question whether an individual is a

11   policymaker is a question of law for the court.  Hobler v. Brueher, 325 F.3d 1145, 1151 (9th

12   Cir. 2003).

13         If the court determines that the employee is in a policymaking position, that disposes

14   of any First Amendment retaliation claim.  Biggs v. Best, Best & Krieger, 189 F.3d 989,

15   994-95 (9th Cir. 1999).  A policymaker holds his/her office at the will of the employer, and

16   may be demoted by reason of political activity; thus, the First Amendment does not bar

17   adverse employment action based solely on the content of a policymaker's expressive

18   activities or beliefs.  Rutan v. Republican Party of Illinois, 497 U.S. 62, 74 (1990).

19         In Branti v. Finkel, 445 U.S. 507 (1980), the Supreme Court found that the ultimate

20   inquiry is not whether the label "policymaker" fits a particular position, but "whether the

21   hiring authority can demonstrate that the party affiliation is an appropriate requirement

22   for the effective performance of the public office involved."  Id. at 518.  The Court

23   concluded that the employment of an assistant public defender cannot be conditioned on

24   the employee's allegiance to the political party or the control of the county government.  Id.

25   at 519.

26         Although the Branti Court specifically declined to decide whether the same rule

27   would apply to a deputy district attorney, it did note the distinction between an assistant

28   public defender, who acts more like a private attorney for criminal defendants, and a deputy

12

United States District Court
For the Northern District of California

1   district attorney, who represents the state as a prosecutor.  Id. at 519.  Later, in Fazio v.

2   City and County of San Francisco, 125 F.3d 1328 (9th Cir. 1997), the Ninth Circuit held that

3   an assistant district attorney who was fired by the District Attorney for political reasons was

4   a "policymaker" and therefore could not state a First Amendment claim based on his firing.

5          In this case, defendants assert that plaintiff meets the definition of "policymaker,"

6   based on the allegations in the FAC that from 2004 to January 2011, plaintiff held the

7   position of Senior Deputy District Attorney in charge of the Richmond branch of the D.A.'s

8   Office – a job that required a combination of management skills, legal expertise, and the

9   ability to interact with the judiciary, local police agencies, the community, and the press.

10  FAC ¶ 14.  In addition, defendants note, plaintiff alleges that he had ascended to "the top

11  ranks of the District Attorney's Office."  FAC ¶ 15.  Defendants contend that this description

12  necessarily indicates that plaintiff was a policymaker, and that even after he was

13  transferred to the Mental Health Unit, plaintiff was "straightening out the legal mess . . . left

14  behind" and also began trying cases – "a rarity for this unit."  FAC ¶ 28.

15         The court finds that the motion must be GRANTED.  Plaintiff cannot state a First

16  Amendment claim under the facts alleged in the FAC, as a matter of law.  Based on the

17  allegations in the FAC, he was clearly in a "policymaking" position, and Peterson was

18  entitled, after the election, to reassign employees into policymaking positions as he wished.

19  Plaintiff cannot maintain a First Amendment claim based simply on the fact that a newly

20  elected District Attorney opted to place his own people around him, and to move plaintiff to

21  another unit within the D.A.'s Office.

22         3.     Fourteenth Amendment claim

23         In the third cause of action, plaintiff alleges a claim of violation of the Equal

24  Protection Clause of the Fourteenth Amendment, against all defendants.  The Fourteenth

25  Amendment is not self-executing, and can only be brought by plaintiff pursuant to a § 1983

26  claim.  Magana v. Com. of the Northern Mariana Islands, 107 F.3d 1436, 1441-42 (9th Cir.

27  1997) (Congress did not intend Fourteenth Amendment to be "self-enforcing," and § 1983

28  is the "modern-day statute 'to enforce the Provisions of the Fourteenth Amendment to the

**United States District Court**
For the Northern District of California

1  Constitution'"); see also Ngiraingas v. Sanchez, 495 U.S. 182, 187 (1990) (section 1983

2  was originally enacted as § 1 of the Civil Rights Act of 1871, the purpose of which was to

3  enforce the provisions of the Fourteenth Amendment)).  Accordingly, the court construes

4  this as an equal protection claim under § 1983.

5       To state a claim under § 1983, a plaintiff must allege two essential elements: 1) that

6  a right secured by the Constitution or laws of the United States was violated, and 2) that

7  the alleged violation was committed by a person acting under the color of state law.  West

8  v. Atkins, 487 U.S. 42, 48 (1988).  Here, plaintiff alleges that defendants violated his right to

9  be free from workplace discrimination and his right to equal protection under the Fourteenth

10  Amendment to the United States Constitution.

11       Defendants argue that the equal protection claim should be dismissed because

12  plaintiff alleges no facts showing intentional discrimination by the defendants or that race

13  motivated any of their alleged wrongful acts.

14       "The Equal Protection Clause of the Fourteenth Amendment commands that no

15  State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which

16  is essentially a direction that all persons similarly situated should be treated alike."  City of

17  Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (citation omitted); Thornton

18  v. City of St. Helens, 425 F.3d 1158, 1168 (9th Cir. 2005) (evidence of different treatment

19  of unlike groups does not support an equal protection claim).

20       To state a claim under § 1983 for an equal protection violation, a plaintiff must allege

21  facts showing that the defendants acted with an intent or purpose to discriminate against

22  the plaintiff based upon membership in a protected class, and that plaintiff was treated

23  differently from persons similarly situated.  See Barren v. Harrington, 152 F.3d 1193, 1194

24  (9th Cir. 1998); see also Washington v. Davis, 426 U.S. 229, 239-40 (1976); Serrano v.

25  Francis, 345 F.3d 1071, 1081-82 (9th Cir. 2003); Lee v. City of Los Angeles, 250 F.3d 668

26  (9th Cir. 2001).

27       A plaintiff may satisfy this standard by alleging (1) that he/she was treated differently

28  from others similarly situated; (2) that this unequal treatment was based on an

1  impermissible classification; (3) that the defendant acted with discriminatory intent in

2  applying this classification; and (4) that he/she suffered injury as a result of the

3  discriminatory classification.  See, e.g., Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256,

4  279 (1979); see also Lam v. City and County of San Francisco, __ F.Supp. 2d __, 2012 WL

5  1253199 at *20 (N.D. Cal. April 13, 2012).[4]

6         The court finds that the motion must be GRANTED.  Plaintiff in the present case

7  appears to be basing his equal protection claim on both discrimination and harassment.

8  For the reasons stated above with regard to the first cause of action, however, it is not clear

9  which facts are intended to support which claim.  And as to the facts that are alleged, there

10  are none that support an inference of intentional discrimination or harassment based on

11  race.

12         In addition, as explained above, a harassment claim must allege that the

13  harassment affected the conditions of plaintiff's employment – that is, that it was sufficiently

14  severe or pervasive so as to alter the conditions of employment and create an abusive

15  working environment.  Here, however, plaintiff has failed to plead facts showing that he

16  suffered from racial harassment, or that the harassment was sufficiently severe or

17  pervasive so as to alter the conditions of employment.

18         4.     Monell claim

19         In the fourth cause of action, plaintiff alleges a claim of "unconstitutional policy and

20  practice" under 42 U.S.C. §§ 1983 and 1986, and the Fourteenth Amendment, against

21  Contra Costa County, pursuant to Monell v. New York City Dep't of Soc. Servs., 436 U.S.

22  658 (1978).

23         As an initial matter, the court notes that a claim can be stated under § 1986 only if

24  the complaint states a claim under 42 U.S.C. § 1985.  See Karim-Panahi v. Los Angeles

25  _____

26  [4] Claims of workplace retaliation are outside of the scope of equal protection under the Fourteenth Amendment.  See Sizemore v. City of Dallas, 443 F.Supp. 2d 1201, 1204-05 (D.Or.
27  2009) (holding, based on reasoning in decisions from the First, Second, Sixth, Seventh, and Tenth Circuits, that the plaintiff was precluded from bringing an employment-related retaliation
28  claim under 42 U.S.C. § 1983 for an alleged equal protection violation).

United States District Court
For the Northern District of California

15

**United States District Court**
For the Northern District of California

1 | Police Dept., 839 F.2d 621, 626 (9th Cir. 1988).  Accordingly, as no § 1985 claim is stated

2 | in the FAC, the § 1986 claim must be dismissed.  In addition, the court notes, as explained

3 | above, that any Fourteenth Amendment claim must be brought under § 1983.

4 |         As for the § 1983 claim, defendants contend that plaintiff has failed to allege facts

5 | sufficient to state a claim against a municipality.  In addition, defendants assert, municipal

6 | liability is dependent on a violation of constitutional rights, and without an underlying

7 | constitutional violation, there can be no municipal liability.  Here, defendants argue,

8 | because none of the defendants violated plaintiff's federally protected constitutional rights,

9 | the County cannot be liable under § 1983.

10 |         Local governments are "persons" subject to suit for constitutional violations under

11 | § 1983.  See Monell, 436 U.S. at 691.  However, local governments can only be sued

12 | where the claims arise out of unconstitutional actions by their employees who implement or

13 | execute a "policy statement, ordinance, or decision officially adopted and promulgated by

14 | that body's officers . . . ."  Id. at 690-91.  That is, a public entity "cannot be held liable solely

15 | because it employs a tortfeasor."  Id. at 691.

16 |         A Monell claim for section 1983 liability against a public entity may be stated in one

17 | of three circumstances – (1) when official policies or established customs inflict a

18 | constitutional injury; (2) when omissions or failures to act amount to a local government

19 | policy of "deliberate indifference" to constitutional rights; or (3) when a local government

20 | official with final policy-making authority ratifies a subordinate's unconstitutional conduct.

21 | Clouthier v. County of Contra Costa, 591 F.3d 1232, 1249-50 (9th Cir. 2010) (synthesizing

22 | Supreme Court authorities); Fuller v. City of Oakland, 47 F.3d 1522, 1534 (9th Cir. 1995).

23 | These limitations also apply under § 1981.  Fed'n of African American Contractors v. City of

24 | Oakland, 96 F.3d 1204, 1214-15 (9th Cir. 1996).

25 |         Here, plaintiff has failed to state a claim against the County under this standard.  He

26 | alleges that the actions of the individual defendants (1) were caused by customs or

27 | practices of the District Attorney's Office; (2) were caused by deliberate indifference of the

28 | District Attorney's Office; and/or (3) were ratified by final decision-makers of the District

16

United States District Court

For the Northern District of California

1  Attorney's Office." FAC ¶ 53. However, he has alleged no facts showing any alleged

2  discriminatory or retaliatory conduct that stemmed from official policy or custom.

3        Prior to Iqbal and Twombly, the long-standing rule was that a plaintiff need only

4  make "a bare allegation that the individual [defendants'] conduct conformed to official

5  policy, custom, or practice." Karim–Panahi, 839 F.2d 621, 623 (9th Cir. 1988). Indeed, the

6  Supreme Court rejected a heightened pleading standard for Monell claims in Leatherman v.

7  Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993).

8  While neither Iqbal nor Twombly overruled Leatherman, the pleading standard for Monell

9  claims has been thrown into question, and, in the Ninth Circuit at least, appears to have

10  been modified.

11        In Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011), cert. denied, 132 S.Ct. 2101

12  (2012), the Ninth Circuit considered the impact of Iqbal and Twombly, and concluded that a

13  pleading of municipal liability "must contain sufficient allegations of underlying facts to give

14  fair notice and to enable the opposing party to defend itself effectively," and that the facts

15  must "plausibly suggest an entitlement to relief." Id. at 1216 (citations omitted); see also

16  AE ex rel. Hernandez v. County of Tulare, 666 F.3d 631, 636-38 (9th Cir. 2012) (noting

17  impact of recent Supreme Court decisions, including Twombly/Iqbal, on pleading

18  standards, and applying Starr to municipal liability claims, holding that "plausible facts

19  supporting a policy or custom . . . could . . . cure[ ] the deficiency in [a] Monell claim").

20        Here, the court finds that while the FAC alleges all three bases for Monell liability, it

21  asserts legal conclusions only. That is, there are no facts pled in support of any of these

22  theories of liability. Accordingly, the motion to dismiss must be GRANTED with leave to

23  amend to allege facts sufficient to state a claim against the County under §§ 1981 and

24  1983.

25                                    **CONCLUSION**

26        In accordance with the foregoing, the court GRANTS the motion. The second cause

27  of action alleging retaliation in violation of the First Amendment is dismissed with prejudice.

28  The remaining claims are dismissed with leave to amend.

17

United States District Court

For the Northern District of California

1

An amended complaint shall be filed no later than November 9, 2012.  Plaintiff shall

2  add no new parties or causes of action unless he first seeks leave of court.

3

4  **IT IS SO ORDERED.**

5  Dated: October 9, 2012

6                                          PHYLLIS J. HAMILTON
                                          United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28