1
2
3
4                         UNITED STATES DISTRICT COURT
5                         NORTHERN DISTRICT OF CALIFORNIA
6
7
8    DAVID GLENN BROWN,
9              Plaintiff,                      No. C 12-1923 PJH
10        v.                                   **ORDER GRANTING MOTION TO**
                                               **DISMISS IN PART AND DENYING**
11   CONTRA COSTA COUNTY, et al.,              **IT IN PART**
12             Defendants.
     _____/
13
14        Before the court is the motion of defendants Contra Costa County, Mark Peterson,
15   Douglas MacMaster, and Karen Zelis-Holder for an order dismissing the fifth amended
16   complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.
17   Having read the parties' papers and carefully considered their arguments and the relevant
18   legal authority, the court hereby GRANTS the motion in part and DENIES it in part.
19                                 **BACKGROUND**
20        This is an employment case alleging racial discrimination, harassment, and
21   retaliation.  Plaintiff David Glenn Brown is an attorney who began working for the office of
22   the Contra Costa District Attorney ("DA") in July 1986.  In September 2002, he was
23   assigned to the Richmond branch of the DA's office as a "felony expediter."  He assisted
24   the Senior Deputy District Attorney in charge of the office, and was also in charge of
25   supervising less experienced attorneys.  Fifth AC ¶ 19.
26        Plaintiff alleges that at about the time he began working at the Richmond branch in
27   2002, he was speaking with a supervisor and a junior attorney, when defendant Douglas
28   MacMaster ("MacMaster") approached and interrupted the conversation.  MacMaster

allegedly "stated in an exaggerated ghetto tone, 'If we did that the next thing Brown . . . would be asking is "where da white women at!"'"  Fifth AC ¶ 25.

Plaintiff complained about this incident to MacMaster's supervisor, and when MacMaster learned about this, he allegedly stated (not clear to whom) that he hated plaintiff and had always hated him.  Fifth AC ¶ 28.  Plaintiff asserts that he had "little subsequent contact" with MacMaster.  Fifth AC ¶ 29.

In 2004, the then-DA, Robert Kochly, promoted plaintiff to the position of Senior Deputy District Attorney, at which point plaintiff was placed in charge of the Richmond branch of the DA's office.  At that time there were 93 attorneys working in the Richmond office, plus three investigators and approximately ten clerical staff.  Fifth AC  ¶¶ 18-21.

When plaintiff was promoted to Senior Deputy DA, there were four other Senior Deputy DAs, all of whom were white.  Plaintiff is African-American.  Plaintiff claims that after his promotion, Mark Peterson ("Peterson" – the current DA and one of the defendants in this case), made "multiple complaints" to the then-DA (Kochly) about plaintiff's promotion.  Fifth AC ¶¶ 23-24.

Peterson was elected DA of Contra Costa County in November 2010.  He took office in January 2011, at which point he "demoted" all four of the Senior Deputy DAs, from Level V to Level IV.  This included plaintiff.  Peterson allegedly promoted MacMaster, Karen Zelis-Holder ("Zelis-Holder," defendant herein), Tom Kensok, and Hal Jewett to the Senior Attorney positions.  Fifth AC ¶ 31.

Plaintiff asserts that he met with Peterson in December 2010, at which time Peterson advised him about the pending "demotion."  Plaintiff claims that Zelis-Holder was present at the meeting.  According to plaintiff, she had "had made it clear to Peterson prior to the demotion that she did not like the [p]laintiff and that she had wanted to be present to see him get demoted for personal reasons."  Fifth AC ¶ 49.

Plaintiff also claims that Zelis-Holder – who is also African-American – had told him "on numerous occasions" that she does not like or trust African-American men, and that she also repeated this to other employees of the DA's office.  Fifth AC ¶ 50.  He asserts

United States District Court
For the Northern District of California

that Zelis-Holder made other false statements, including that plaintiff would go to the movies on office time, which made it impossible for the office managers to locate him. Fifth AC ¶ 52. She also allegedly told plaintiff's "fellow co-workers" that they should exclude African-American jurors from their juries.

Plaintiff asserts that his new assignment was to work in the Mental Health/Sexually Violent Predators Unit ("Mental Health Unit"), which he described in a prior version of the complaint as "a post in 'Siberia' for attorneys who are being punished." See FAC ¶ 26.

In March 2011,[1] MacMaster allegedly sent an attorney in the County Counsel's office an email commenting negatively on plaintiff's ability to do basic legal research. Plaintiff asserts that this conduct (sending the email) affected his "reputation and status in the legal community." Fifth AC ¶¶ 32-33. In a prior version of the complaint, plaintiff alleged that MacMaster's "previous racially offensive comment" (referring to the "where da white woman at" comment in 2002) combined with this 2011 implication that plaintiff did not have the ability to do basic research, "foster[ed] the racial stereotype of Blacks not having intelligence." Third Amended Complaint ("TAC") ¶ 40. Plaintiff makes a similar allegation in the present complaint. Fifth AC ¶ 72.

Plaintiff complained to Peterson, and asserts that Peterson assigned Tom Kensok, MacMaster's best friend in the office, to conduct the investigation. Plaintiff claims that this was "not a good faith investigation into what had happened" and that MacMaster "was never punished for his conduct and was subsequently promoted" after plaintiff had made his complaint to Peterson. Fifth AC ¶¶ 34-36.

Plaintiff asserts that in July 2011, despite the fact that he was doing a good job in the Mental Health Unit, he was again reassigned – to the Juvenile Unit. Plaintiff claims that Peterson "assigned" MacMaster to deliver this news, and asserts that MacMaster told him the reason for the transfer was that plaintiff was unhappy in the Mental Health Unit. Plaintiff contends that this was a false and pretextual statement, and that the real reason

---

[1] Plaintiff says March 2010 in the Fifth AC, but that makes no sense in the context of the factual allegations.

United States District Court
For the Northern District of California

for the transfer was that he had filed a complaint against MacMaster three months before. He also asserts that MacMaster told other attorneys in the office that when plaintiff was transferred to the Juvenile Unit he would not take the job seriously, and another junior attorney would have to be transferred to the Unit to handle the more serious cases. Plaintiff claims that this statement was false, and that it damaged his standing and reputation in the office.  Fifth AC ¶¶ 37-40.

Around this same time, according to plaintiff, MacMaster decided on a Friday to continue a trial that plaintiff was to start on a Monday, and did not notify plaintiff of the continuance until Sunday (instead of on the Friday when the decision was made).  Fifth AC ¶ 47.

In the prior versions of the complaint, plaintiff alleged that on July 11, 2011 (the day before he was supposed to begin his assignment with the Juvenile Unit), he had requested a meeting with Dan Cabral, and that Cabral had told plaintiff he (Cabral) had been warned by his supervisors about plaintiff.  Plaintiff asserted, however, that Cabral would not repeat what he had been told, and that in consequence, plaintiff left the meeting, stating that he did not like being lied to.  FAC ¶ 36.  Plaintiff was subsequently summoned to a meeting with MacMaster, where MacMaster and Cabral allegedly accused plaintiff of being "insubordinate," and demanded that he sign a disciplinary letter. When plaintiff refused to do so, they allegedly told him he was not free to leave, and then accused him of failing to attend another meeting, which plaintiff claims he had in fact attended.  FAC ¶ 37.

In the Fifth AC, plaintiff has collapsed those events into what appears to be a single occurrence, and now alleges that MacMaster's "harassment . . . continued when he falsely accused [plaintiff] of having failed to attend a mandatory office meeting and attempted to discipline him for it" and "then accused [plaintiff] of being insubordinate, without any attempt to determine what had occurred."  Fifth AC ¶ 42.  Both the FAC and the TAC provide a different sequence of events.  See FAC ¶ 35-38; TAC ¶¶ 47-51.

In August 2011, plaintiff went out on medical leave (stress leave), apparently without ever resuming his duties at the DA's office.  He filed a workers' compensation claim, which

United States District Court

For the Northern District of California

1  was eventually denied.  That denial is on appeal.

2      Plaintiff claims that in December 2011,[2] he was subpoenaed to testify in a Merit

3  Board hearing, and that Zelis-Holder made a "false statement" to the tribunal to prevent him

4  from testifying.[3]

5      Plaintiff alleges that in March 2012, MacMaster sent "sexually and racially offensive

6  videos" to plaintiff's co-workers and other court personnel and staff.  One of the videos

7  allegedly portrayed an African-American male "dressed in an oversized white  tuxedo while

8  singing about getting high and partying."  Plaintiff asserts that this constituted a "very

9  negative depiction of African/American males."  Although plaintiff had been out on stress

10  leave for several months at that point, he claims that MacMaster "knew the [p]laintiff was

11  present when he boasted about sending the videos" and that he "knew or should have

12  known that plaintiff would find these videos offensive."  Fifth AC ¶ 45.  He complains that

13  Peterson never disciplined MacMaster for this offensive conduct.  Fifth AC ¶ 46.

14      Plaintiff filed the present action on April 18, 2012, using the court's "Employment

15  Discrimination Complaint" form, and alleging discrimination, harassment, and retaliation

16  based on race, against the Contra Costa DA's Office, Doug MacMaster, Mark Peterson,

17  and Karen Zelis-Holder.  He alleged that he had filed administrative charges with the EEOC

18  in September 2011, and that he had received a right-to-sue letter in February 2012.

19      However, plaintiff subsequently filed a first amended complaint in which he did not

20  include the Title VII claims, but did allege four causes of action – (a) discrimination,

21  _____

22  [2] While the Fifth AC gives the date as October 2010, prior versions of the complaint use
   the December 2011 date, e.g., FAC ¶ 38; and defendants have provided part of a reporter's
23  transcript showing a date of December 2011.

24  [3] In the TAC, plaintiff alleged that he was subpoenaed to testify, and that Zelis-Holder
   prevented him from testifying by telling the hearing board that plaintiff had a suit against the
25  County and had his own agenda he wanted to promote; and that she also told the board
   "confidential information" about plaintiff's work status.  TAC ¶ 60.  In the FAC, plaintiff alleged
26  that the employee "asked" him to testify, and that Zelis-Holder (who was representing the
   County at the hearing) "announced to the tribunal that [p]laintiff should not be allowed to testify
27  by revealing that [p]laintiff was out on sick leave, a violation of Contra Costa County policy,"
   and that she also asserted that plaintiff had a lawsuit pending against the County, which
28  plaintiff asserted was not true.  FAC ¶ 38.  (However, plaintiff did not dispute the fact that he
   had filed an EEOC administrative charge in September 2011, prior to the Merit Board hearing.)

United States District Court

For the Northern District of California

1  retaliation, and harassment under § 1981; (b) a § 1983 claim alleging First Amendment

2  violation; and (c) a § 1983 claim alleging discrimination in violation of Fourteenth

3  Amendment's Equal Protection Clause; and (d) a <u>Monell</u> claim against the County.

4    Defendants moved to dismiss, and the court granted the motion with leave to

5  amend.  On November 9, 2012, plaintiff filed a second amended complaint, which he called

6  the "third amended complaint," and in which the vast majority of his factual allegations were

7  made "on information and belief."  Defendants again moved to dismiss.  The court granted

8  the motion, with leave to amend.

9    On April 26, 2013, plaintiff filed a fourth amended complaint, defendants moved to

10  dismiss, and the court granted the motion with leave to amend.  The court advised plaintiff

11  that any further dismissal would be with prejudice.  On October 30, 2012, plaintiff filed a

12  fifth amended complaint, which he called the "proposed fourth amended complaint."

13    Plaintiff asserts three causes of action in the Fifth AC – (1) a claim under § 1981 for

14  discrimination, harassment, and retaliation, against MacMaster, Zelis-Holder, and Peterson;

15  (2) a claim under § 1983 for violation of equal protection rights, against MacMaster, Zelis-

16  Holder, and Peterson; and (3) a <u>Monell</u> claim against the County.  Defendants now seek an

17  order dismissing the Fifth AC.

**DISCUSSION**

18

19  A.    Legal Standard

20    A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal

21  sufficiency of the claims alleged in the complaint.  <u>Ileto v. Glock, Inc.</u>, 349 F.3d 1191,

22  1199-1200 (9th Cir. 2003).  Review is limited to the contents of the complaint.  <u>Allarcom</u>

23  <u>Pay Television, Ltd. v. Gen. Instrument Corp.</u>, 69 F.3d 381, 385 (9th Cir. 1995).  To survive

24  a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the

25  minimal notice pleading requirements of Federal Rule of Civil Procedure 8, which requires

26  that a complaint include a "short and plain statement of the claim showing that the pleader

27  is entitled to relief." Fed. R. Civ. P. 8(a)(2).

28    A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the

6

United States District Court

For the Northern District of California

1    plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support

2    a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

3    1990). The court is to "accept all factual allegations in the complaint as true and construe

4    the pleadings in the light most favorable to the nonmoving party." Outdoor Media Group,

5    Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007). However, legally

6    conclusory statements, not supported by actual factual allegations, need not be accepted.

7    Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009); see also In re Gilead Scis. Sec. Litig., 536

8    F.3d 1049, 1055 (9th Cir. 2008) (district court is not required to accept as true "allegations

9    that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences").

10   The allegations in the complaint "must be enough to raise a right to relief above the

11   speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations and

12   quotations omitted).

13          A motion to dismiss should be granted if the complaint does not proffer enough facts

14   to state a claim for relief that is plausible on its face. See id. at 558-59. A claim has facial

15   plausibility when the plaintiff pleads factual content that allows the court to draw the

16   reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556

17   U.S. at 678 (citation omitted). "[W]here the well-pleaded facts do not permit the court to

18   infer more than the mere possibility of misconduct, the complaint has alleged – but it has

19   not 'show[n]' – 'that the pleader is entitled to relief.'" Id. at 679. In the event dismissal is

20   warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved

21   by any amendment. See Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

22          Although the court generally may not consider material outside the pleadings when

23   resolving a motion to dismiss for failure to state a claim, the court may consider matters

24   that are properly the subject of judicial notice. Lee v. City of Los Angeles, 250 F.3d 668,

25   688-89 (9th Cir. 2001); Mack v. South Bay Beer Distributors, Inc., 798 F.2d 1279, 1282 (9th

26   Cir. 1986). Additionally, the court may consider exhibits attached to the complaint, see Hal

27   Roach Studios, Inc. V. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir.

28   1989), as well as documents referenced extensively in the complaint and documents that

United States District Court

For the Northern District of California

1  form the basis of a the plaintiff's claims.  See No. 84 Employer–Teamster Joint Counsel

2  Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

3  B.     Defendants' Motion

4         1.     Section 1981 claim

5         In the first cause of action, plaintiff alleges discrimination, retaliation, and

6  harassment under § 1981.  Section 1981 guarantees "all persons" the right to "make and

7  enforce contracts."  Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1122 (9th

8  Cir. 2008) (quoting 42 U.S.C. § 1981(a)).  Making and enforcing contracts includes the

9  "making, performance, modification, and termination of contracts, and the enjoyment of all

10  benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C.

11  § 1981(b).

12            a.     Discrimination

13         To state a claim of discrimination under § 1981, a plaintiff must identify an impaired

14  "contractual relation," by alleging facts showing that intentional racial discrimination

15  prevented the creation of a contractual relationship or impaired an existing contractual

16  relationship.  See Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006).  That is, he

17  must allege facts showing that he is a member of a racial minority, that the defendant

18  intentionally discriminated against him on the basis of race, and that said discrimination

19  concerned at least one statutorily enumerated activity, such as the making or enforcement

20  of contracts.  Mian v. Donaldson, Lufkin & Jenrette Secs. Corp., 7 F.3d 1085, 1087 (2nd

21  Cir. 1993), cited in Peterson v. State of Cal. Dept. of Corrs. and Rehab., 451 F.Supp. 2d

22  1092, 1101 (E.D. Cal. 2006).  Thus, in the employment context, the plaintiff must allege

23  facts showing intentional or purposeful discrimination based on race in the workplace.  See

24  General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 387-91 (1982); see also

25  Johnson, 534 F.3d at 1123 (§ 1981 covers only discriminatory conduct based on race or

26  ethnicity).

27         The court finds that the motion must be GRANTED as to the § 1981 discrimination

28  claim because plaintiff has not pled facts showing intentional discrimination based on race

United States District Court

For the Northern District of California

– that is, he has not alleged facts sufficient to create a plausible inference that any of the defendants took an adverse action against him because of his race.  He claims that intent to discriminate is established by the repeated allegation that he was treated differently than non-African-American attorneys or non-African-American employees.  However, this conclusory assertion is generally unsupported by facts, and is therefore insufficient to satisfy the element of "intent to discriminate."

Nor has plaintiff alleged any facts showing that he suffered an adverse action based on race.  For example, the court previously ruled that Peterson had the right to "demote" plaintiff from Level V to Level IV, and plaintiff himself has conceded that following the election, all four Level V Senior DAs – three of whom were white – were "demoted to Level IV.  Plaintiff has not alleged facts showing that either the transfer to Mental Health or the transfer to Juvenile was an adverse action.  Nor has he alleged facts showing that Peterson's refusal to place him on administrative leave, at a time when he was already out on medical leave, was an adverse action motivated by racial animus.

   b. Retaliation

Section 1981 also encompasses employment-related retaliation claims.  CBOCS West, Inc. v. Humphries, 553 U.S. 442, 452-57 (2008); Johnson v. Lucent Techs., Inc., 653 F.3d 1000, 1006 (9th Cir. 2011).  As with other employment-related claims, a plaintiff alleging a claim of retaliation under § 1981 must allege facts showing that he engaged in an activity protected by the statute, and that he suffered an adverse employment action because he engaged in that activity.  See, e.g., Stegall v. Citadel Broad. Co., 350 F.3d 1061, 1065-66 (9th Cir. 2003).

The court finds that the motion must be GRANTED as to the § 1981 retaliation claim.  The only action plaintiff identifies as "retaliatory" is the July 2011 transfer from the Mental Health Unit to Juvenile, which was ordered by Peterson, supposedly in retaliation for plaintiff's having filed a complaint regarding MacMaster.  Thus, plaintiff fails to state any retaliation claim against MacMasters or Zelis-Holder.

As against Peterson, plaintiff alleges no facts showing that the transfer was in

United States District Court

For the Northern District of California

retaliation for his exercise of a contractual right protected under § 1981.  Plaintiff asserts

that the transfer was in retaliation for his having complained about MacMaster's email

suggesting that plaintiff's legal research skills were deficient.  There was no racial

component to that email, and other than claiming that the email "affected [his] reputation

and status in the legal community," plaintiff has not pled any facts showing that his

complaint about the email related to an unlawful employment practice that violated his right

to "make contracts" protected under § 1981.

               c.       Harassment

Finally, in order to state a claim for workplace harassment or hostile work

environment, a plaintiff must allege facts indicating that he was subjected to unwelcome

verbal or physical conduct based on his race, and that the conduct was sufficiently severe

or pervasive to alter the conditions of his employment and create an abusive working

environment.  See, e.g., Vasquez v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir.

2003); Manatt v. Bank of America, NA, 339 F.3d 792, 798 (9th Cir. 2003); see also Harris v.

Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993); Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67

(1986).

To determine whether conduct was sufficiently severe or pervasive to violate Title

VII, courts look at the totality of the circumstances.  Harris, 510 U.S. at 23 (1993).

Occasional or isolated incidents are not actionable; rather, a plaintiff must show a

concerted pattern of harassment of a repeated, routine, or generalized nature.  Faragher v.

City of Boca Raton, 524 U.S. 775, 788 (1998); McGinest v. GTE Serv. Corp., 360 F.3d

1103, 1113 (9th Cir. 2004); Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463 (9th

Cir. 1994).

In addition, "[t]he working environment must both subjectively and objectively be

perceived as abusive." Vasquez, 349 F.3d at 642 (quoting Brooks v. City of San Mateo,

229 F.3d 917, 923 (9th Cir. 2000)).  Subjectively, the evidence must show that the

harassment is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.  See McGinest, 360 F.3d at

United States District Court

For the Northern District of California

1113.  An isolated comment will not suffice, but neither is psychological injury required.  Id.

(citing Harris, 510 U.S. at 22).  "It is enough 'if such hostile conduct pollutes the victim's

workplace, making it more difficult for her to do her job, to take pride in her work, and to

desire to stay on in her position.'"  Id. (quoting Steiner, 25 F.3d at 1463).

Objectively, the court looks at "all the circumstances," including "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance."  Harris, 510 U.S. at 23; see also McGinest, 360 F.3d at 1113.  The analysis

is made from the perspective of a reasonable person belonging to the same racial or ethnic

group as the plaintiff.  Craig v. M & O Agencies, Inc., 496 F.3d 1047, 1055 (9th Cir. 2007)

(citing Fuller v. City of Oakland, Cal., 47 F.3d 1522, 1527 (9th Cir. 1995)).  The required

level of severity or seriousness varies inversely with the pervasiveness or frequency of the

conduct.  Harris, 510 U.S. at 23; McGinest, 360 F.3d at 1113.

The court finds that the motion must be DENIED as to the § 1981 harassment claim.

Primarily, the court finds that disputed factual issues make this claim inappropriate for

disposition in a Rule 12(b)(6) motion.  The determination of whether racially motivated

conduct is severe and pervasive and whether a work environment is sufficiently abusive

raises questions that are best evaluated in light of an evidentiary record.

2.    Section 1983 Equal Protection Claim

In the second cause of action, under § 1983 claim, plaintiff alleges that he was

treated differently than non-African-American attorneys by MacMaster, Zelis-Holder, and

Peterson, in violation of the Equal Protection Clause.

To state a claim under § 1983, a plaintiff must allege that a right secured by the

Constitution or laws of the United States was violated, and that the alleged violation was

committed by a person acting under the color of state law.  West v. Atkins, 487 U.S. 42, 48

(1988).  Here, plaintiff asserts that defendants violated his right to equal protection, which

includes the right to be free from workplace discrimination and harassment based on race.

"The Equal Protection Clause of the Fourteenth Amendment commands that no

**United States District Court**

For the Northern District of California

State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (citation omitted); Thornton v. City of St. Helens, 425 F.3d 1158, 1168 (9th Cir. 2005) (evidence of different treatment of unlike groups does not support an equal protection claim).

To state a claim for violation of the Equal Protection Clause, plaintiff must allege facts showing that defendants acted with an intent or purpose to discriminate against him based on his membership in a protected class. Barren v. Harrington, 152 F.3d 1193, 1194-95 (9th Cir. 1998). That is, he must plead intentional, unlawful discrimination, or allege facts from which discriminatory intent may be inferred. Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1026 (9th Cir. 1998); see also Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003) (intentional discrimination means that a defendant acted, at least in part, because of a plaintiff's protected status).[4]

The court finds that defendants' motion must be GRANTED. For reasons similar to those stated above with regard to the § 1981 discrimination claim, plaintiff has alleged no facts sufficient to raise a plausible inference of racial discrimination. In particular, plaintiff repeatedly alleges that defendants treated him "differently than similarly-situated African-American attorneys," but fails to plead any facts sufficient to show discriminatory intent. See, e.g. Fifth AC ¶¶ 98-105.

The court previously stated in the order granting the motion to dismiss the Fourth Amended Complaint that it is "insufficient for the plaintiff to simply allege . . . without more – that he was "treated differently than other similarly situated non-African-American" employees. He must allege facts showing that there were similarly-situated non-African-American employees who were treated more favorably." September 27, 2013 Order (Doc. 78) at 11. Here, plaintiff simply repeats the conclusory allegation that he was "treated

---

[4]  Both § 1981 and the Equal Protection Clause prohibit only discrimination that is purposeful or intentional. General Bldg. Contractors, 458 U.S. at 389; see also Grutter v. Bollinger, 539 U.S. 306, 343 (2003); Gratz v. Bollinger, 539 U.S. 244, 276 n.23 (2003).

United States District Court

For the Northern District of California

1   differently," which, as the court has already indicated, is insufficient to create a inference of

2   discriminatory intent.

3        3.   Monell claim

4        Plaintiff asserts a claim against the County of Contra Costa under Monell v. New

5   York City Dept. of Social Services, 436 U.S. 658 (1978).  Local governments are "persons"

6   subject to liability under § 1983 where official policy or custom causes a constitutional tort.

7   See id. at 690.  To impose liability on local governments under § 1983 for a violation of

8   constitutional rights, a plaintiff must show (1) that he possessed a constitutional right of

9   which he was deprived; (2) that the local government had a policy; (3) that this policy

10   amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) that the

11   policy is the moving force behind the constitutional violation.  See Plumeau v. School Dist.

12   #40 County of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997).

13        A Monell claim for § 1983 liability based on public policy can be stated in one of

14   three ways – (1) when official policies or established customs inflict a constitutional injury;

15   (2) when omissions or failures to act amount to a local government policy of "deliberate

16   indifference" to constitutional rights; or (3) when a local government official with final policy-

17   making authority ratifies a subordinate's unconstitutional conduct.  Clouthier v. County of

18   Contra Costa, 591 F.3d 1232, 1249-50 (9th Cir. 2010).

19        In addition, however, to properly plead a claim under Monell, it is insufficient to

20   allege simply that a policy, custom, or practice exists that caused the constitutional

21   violations.  AE v. County of Tulare, 666 F.3d 631, 636-37 (9th Cir. 2012).  Pursuant to the

22   more stringent pleading requirements set forth in Iqbal and Twombly, a plaintiff suing a

23   municipal entity must allege sufficient facts regarding the specific nature of the alleged

24   policy, custom or practice to allow the defendant to effectively defend itself, and these facts

25   must plausibly suggest that plaintiff is entitled to relief.  AE, 666 F.3d at 636-37 (citing Starr

26   v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011)).

27        The court finds that defendants' motion must be GRANTED.  Plaintiff bases his

28   Monell claim on the allegation that Peterson, who was a final policy-maker, ratified the

United States District Court
For the Northern District of California

1    conduct of MacMaster and Zelis-Holder, who also had final policy-making authority.

2    Plaintiff also alleges that there is a "pattern and practice" in the Contra Costa DA's office of

3    treating African-Americans disparately because of their race, which appears to be an

4    attempt to allege a <u>Monell</u> violation based on an official policy or established custom.

5         However, plaintiff has alleged no facts showing that his alleged injuries were caused

6    by a custom or policy of discrimination implemented by Contra Costa County.  In particular,

7    he has not alleged facts sufficient to state a plausible claim of § 1983 liability against

8    Contra Costa County under any of the three ways of stating such a claim.

9         First, plaintiff has alleged no facts showing that official policies or established

10   customs have inflicted a constitutional injury.  The Fifth Amended Complaint alleges that

11   there was a "pattern and practice" in the DA's office of "treating African/Americans

12   disparately."  Fifth AC ¶ 113.  This is nothing more than an allegation that there was a

13   "policy" of "discrimination" in the DA's office.

14        The prior order dismissing the fourth amended complaint noted that plaintiff had

15   made essentially the same allegations in that version of the complaint, and found that

16   plaintiff had failed to allege any facts showing that "discrimination" against African-

17   American attorneys was a longstanding practice or that it was so widespread as to have the

18   force of law.  The Fifth AC has not corrected this discrepancy.  The allegation that

19   defendants discriminated against African-American employees (including plaintiff) in the

20   DA's office is not sufficient to support a claim that there was an official policy or custom of

21   discrimination.  And, even if it were, plaintiff still has not alleged facts showing that

22   discrimination against African-American attorneys is a long-standing or widespread custom

23   or practice at the Contra Costa DA's office.

24        Second, the Fifth AC does not allege facts showing that omissions or failures to act

25   amounted to a policy of "deliberate indifference" to constitutional rights.  The only mention

26   of "inaction or deliberate indifference" in the <u>Monell</u> claim is the allegation that "Petersons

27   [sic] conduct in creating a sham investigation by not investigating in good faith the Plaintiffs

28   [sic] complaint against MacMaster further ratified by inaction or deliberate indifference

**United States District Court**
For the Northern District of California

1    MacMaster's improper conduct."  Fifth AC ¶ 106.  It is difficult to tell whether this is intended

2    as an allegation of deliberate indifference to constitutional rights or an allegation of

3    ratification of a subordinate's unconstitutional actions, but in any event, it does not state a

4    <u>Monell</u> claim because plaintiff has not alleged facts showing that MacMaster's comments

5    about his (plaintiff's) research skills violated his constitutional rights.

6         Plaintiff also attempts to argue in his opposition that Peterson, a "final policy-maker,"

7    demonstrated "deliberate indifference" by, <u>e.g.</u>, having MacMaster's good friend conduct

8    the investigation into plaintiff's complaint about the email, allowing "false information" to be

9    placed in plaintiff's personnel file, failing to discipline MacMaster for his conduct in sending

10   a disparaging email or distributing the offensive videos.  However, even if true, none of

11   these can be considered "deliberate indifference" to constitutional rights.

12        Third, the Fifth AC does not allege facts showing that a local government official with

13   final policy-making authority ratified a subordinate's unconstitutional conduct.  Plaintiff

14   asserts that Peterson had "final policy-making authority," and at one point makes the same

15   allegation regarding MacMaster and Zelis-Holder.

16        Whatever status as policy-makers the individual defendants may have under

17   California law, plaintiff has not alleged any facts showing that any of them ratified a

18   subordinate's unconstitutional conduct, or facts showing that they had authority to establish

19   municipal policy with respect to a specific action ordered.  In addition, with regard to

20   Peterson, and the allegation that Peterson "ratified" the alleged  discriminatory conduct

21   going back to 2002, the court notes that such a claim is implausible, as Peterson did not

22   become DA until January 2011.  Moreover, plaintiff alleges no facts showing that Peterson

23   was motivated by racial animus.

24        Finally, the court finds that the <u>Monell</u> claim fails because plaintiff has failed to plead

25   facts showing a constitutional violation.  <u>See</u> <u>Aguilera v. Baca</u>, 510 F.3d 1161, 1174 (9th

26   Cir. 2007); <u>see also</u> <u>Scott v. Henrich</u>, 39 F.3d 912, 916 (9th Cir. 1994) (liability of

27   municipalities or counties "is contingent on a violation of constitutional rights" by individual

28   employees).

**CONCLUSION**

In accordance with the foregoing, defendants' motion is GRANTED in part and DENIED in part.  The motion is GRANTED as to the § 1981 discrimination and retaliation claims, as to the § 1983 equal protection claim, and as to the Monell claim.  As plaintiff has been given multiple opportunities to cure the defects painstakingly set forth herein and in three prior orders (Docket Nos. 27, 52, 78), those claims are dismissed WITH PREJUDICE. The motion is DENIED as to the § 1981 harassment claim.

Defendants shall answer the fifth amended complaint as to the remaining cause of action for racial harassment under § 1981 no later than April 25, 2014.  A case management conference will be scheduled by separate order.

**IT IS SO ORDERED.**

Dated:  April 3, 2014

_____
PHYLLIS J. HAMILTON
United States District Judge

16