UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID GLEN BROWN, <br><br> Plaintiff, <br><br> v. <br><br> CONTRA COSTA COUNTY, et al., <br><br> Defendants. | Case No. 12-cv-01923-VC <br><br> **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. No. 144 |

# INTRODUCTION

David Brown, a former member of the Contra Costa County District Attorney's Office, sued the County, District Attorney Mark Peterson, and two former colleagues in the office – Douglas MacMaster and Karen Zelis – for discrimination, retaliation, and harassment based on his race. Before the case was reassigned to this Court, Judge Hamilton dismissed most of the claims contained in Brown's fifth amended complaint, namely, his Section 1981 race discrimination and retaliation claims, his Section 1983 equal protection claim, and his claim against the County for municipal liability. *See* Doc. No. 88. Brown's only remaining claim against the defendants is for racial harassment under Section 1981. The Court now grants summary judgment for the defendants on that claim.

# BACKGROUND

Viewed in the light most favorable to the plaintiff, the evidence pertaining to the remaining claim is as follows:

David Brown is an attorney who worked for the Contra Costa District Attorney's Office from July 1986 through July 2011, when he left for medical reasons. He subsequently retired in February 2013. Brown is African-American. Douglas MacMaster and Karen Zelis are attorneys

who worked for the District Attorney's Office during much of the same period. MacMaster and Zelis identify as Caucasian and African-American, respectively. Mark Peterson was elected District Attorney in 2010 and took office in 2011. Peterson is Caucasian.

Brown and Zelis were friends between 1986 and 2010. A few times over the years, while they were friends, Zelis mentioned to Brown that she did not trust or like African-American men. Doc. No. 148-1, Depo. of Brown at 241. At the time, Brown did not interpret her comments as applying to him; he did not believe she meant to convey that she did not trust him personally. Depo. of Brown at 233, 241, 432. On a couple of occasions, Zelis commented to others that Brown could not be found at work because he was at the movies. Depo. of Brown at 433-34.

In 2002, Brown was having a conversation with a supervisor and a junior attorney when MacMaster approached and interrupted. MacMaster said something to the effect of, "If we did that, the next thing Brown would be asking is 'where da white women at!'" The parties dispute the context for MacMaster's remark, but Brown testified that the comment was unrelated to the conversation he was having with the other two attorneys. Brown reported the incident to MacMaster's supervisor, Paul Sequiera, who had a talk with MacMaster and told him the comment was inappropriate. Depo. of Brown at 44-45. After this, Brown had little contact with MacMaster. Fifth Am. Compl. ¶ 29.

In 2004, Brown was promoted by then-District Attorney Robert Kochly to serve as a Senior Deputy District Attorney, a policymaking position on the management team. There were five Senior Deputy District Attorneys; Brown was the only African-American. Then, when Peterson was preparing to take office in late 2011, he demoted all five Senior Deputy District Attorneys, including Brown, to install his own management team, as is customary when a new District Attorney is elected. Peterson promoted MacMaster, Zelis, and Tom Kensok, among others, to the Senior Deputy positions. Peterson broke the news of the demotion to Brown in December 2010 in a private meeting with Zelis present. Peterson had been advised by the County Counsel's Office to have a third person present in all his meetings with the outgoing Senior Deputies. Zelis only observed the meeting with Brown; she did not speak. Brown was reassigned to the Mental Health/Sexually Violent Predators Unit.

In March 2011, MacMaster contacted Deputy County Counsel Janet Holmes to request that the County defend Brown in a civil lawsuit filed against him relating to his work in the District Attorney's Office. Holmes responded to MacMaster and Brown, in an email, with information about how to proceed, including instructions for locating a particular County administrative bulletin. Brown subsequently found the bulletin, while MacMaster had been unable to find it. MacMaster later emailed Holmes: "You burst my bubble. Before I read this, I was both impressed and amazed at David's ability to find Admin Bulletin 118.2. I had to ask Cherie Mathisen in our office how to accomplish that." Doc. No. 146, Ex. A. Brown was included on this email. Brown replied to MacMaster, explaining that he did not appreciate MacMaster expressing an opinion about "my knowledge or ability to research an issue to those either inside or especially outside the office." He said he found it "unnecessary and unprofessional," and he was "extremely embarrassed." Brown did not at the time suggest that MacMaster's remark was racially motivated or that he found it racially offensive. MacMaster apologized to Brown, and separately asked Peterson to consider Brown's email an official complaint and to investigate it. Peterson assigned Kensok to do that. Kensok was part of Peterson's management team; he was also friends with MacMaster. MacMaster was not disciplined. On other occasions, MacMaster commented that he was three or four times the lawyer Brown was and made other disparaging remarks about Brown's competence and work ethic.

In July 2011, Peterson transferred Brown from his position in the Mental Health Unit to a position in the Juvenile Unit. Prior to this transfer, all attorneys in the District Attorney's Office were asked to complete a questionnaire regarding attorney assignments. In response to the question whether he preferred to stay in his current unit or be transferred, Brown answered "don't care." He also wrote that his biggest accomplishment in the Mental Health Unit was "cleaning up mess left by my predecessors." MacMaster delivered the news of the transfer to Brown, stating that the reason for the transfer was that Brown was "unhappy" in Mental Health. Brown asserts in his fifth amended complaint that this was pretextual and the transfer was actually racially motivated. But in a prior version of his complaint, Brown described the Mental Health Unit as "a post in 'Siberia' for attorneys who are being punished." And in deposition, Brown testified that he

3

1    does not believe Peterson reassigned him from the Mental Health Unit because of his race. Depo
2    at 331.
3           In preparation for the transfer, and at Brown's request, Dan Cabral, who was the
4    supervising attorney for the Juvenile Unit, organized a meeting with Brown and Barry Grove,
5    another attorney scheduled to start with Brown in the Juvenile Unit. During the meeting, Cabral
6    stated that he'd had a previous meeting with Peterson, MacMaster, and Kensok, in which they
7    suggested he not assign any sexual assault cases to Grove and that he give the gang cases to
8    Melissa Smith (another attorney transferring into the unit who was not present at the meeting).
9    Cabral also mentioned something in reference to Brown. Brown asked Cabral to repeat what they
10   said about him, which Cabral refused to do. When Brown continued to ask Cabral what they said
11   about him, Cabral responded that he misspoke. Brown then accused him of lying and stood up to
12   leave the meeting, at which point Cabral ordered him to stay, saying loudly "David come back to
13   the table" and then, "David, don't leave the room, or I'm going to write you up." Brown left the
14   meeting anyway. Doc. No. 148-3, Reporter's Transcript of Audio Interview of David Brown at 3-
15   6.
16          Two days later, on July 8, 2011, Cabral and MacMaster met with Brown to discuss the
17   previous meeting, and gave Brown a "counseling memo" that they prepared in response. Cabral
18   had informed MacMaster, Kensok, and Peterson of what happened at the meeting and requested
19   that the incident be documented. The resulting counseling memo described the meeting, and also
20   included, at Peterson's request, mention of Brown's failure to attend the entirety of a "State of the
21   Office" meeting at which attendance by all attorneys was required. The memo was not a formal
22   disciplinary action, but directed Brown to "behave courteously and professionally, with all
23   supervisors and coworkers, at all times," to "follow all of our rules and procedures," to comply
24   with directives given by supervisors, and to attend all office meetings and stay until the meeting
25   concludes. It is evident from the transcript of the July 8 meeting that Brown interrupted Cabral
26   and MacMaster frequently and insisted on ending the meeting prematurely. It is undisputed that
27   Brown was not present for the entire State of the Office meeting; Brown testified that he left three
28   times.

4

1   Around this same time, MacMaster decided on a Friday to seek a continuance in one of
2   Brown's cases, *People v. Pegram*, which was scheduled for trial the following Monday. Brown
3   did not learn of the plan to seek a continuance until Sunday.

4   Brown went out on medical leave in July 2011. In December 2011, while he was on leave,
5   Brown was subpoenaed to testify at a hearing before the Contra Costa County Merit Board about a
6   matter involving an employee Brown had supervised. At the hearing, Zelis, who was representing
7   the District Attorney's Office, objected to Brown's testimony on the ground that he had no relevant
8   or admissible evidence to offer. Brown claims that in saying this, Zelis made a "false statement"
9   to the tribunal to prevent him from testifying.

10   In February 2012, while Brown was still on leave, MacMaster sent an email to several
11   coworkers attaching video files of several Saturday Night Live "digital shorts," including one
12   entitled "I'm on a Boat." MacMaster did not send the videos to Brown, but a coworker named
13   Danielle Douglas who had received the email forwarded it to Brown. Doc. No. 146, Ex. C.

14   In January 2013, while on medical leave and after having filed this lawsuit, Brown applied
15   for the position of Chief Deputy to the District Attorney – the number two position in the office.
16   He has testified in this case that he believes he could work effectively with MacMaster and Zelis.
17   Depo. of Brown at 294-95, 300.

## DISCUSSION

19   To defeat the defendants' motion for summary judgment on his claim for racial harassment,
20   Brown must present evidence that he operated in a racially "hostile work environment." In other
21   words, Brown must identify evidence from which a reasonable jury could conclude that he was
22   subjected to unwelcome verbal or physical conduct because of his race, and that the conduct was
23   so severe or pervasive that it effectively altered the conditions of his employment and created an
24   abusive working environment. *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003).
25   The question whether race-based conduct in the workplace is "severe or pervasive" enough to give
26   rise to a harassment claim involves consideration of "all the circumstances, including the
27   frequency of the discriminatory conduct; its severity; whether it is physically threatening or
28   humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)). "The working environment must both subjectively and objectively be perceived as abusive." *Id.* (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000)).

On the surface, most of the conduct about which Brown complains has nothing to do with his race. For example, MacMaster's email to Jan Holmes, which Brown perceived as denigrating his abilities as a lawyer, contained no suggestion of racial animus. The statements by Zelis about Brown going to the movies during work hours contained no indication of racial hostility. There is no hint that MacMaster's decision to request a continuance of Brown's trial was racially motivated. There is nothing to suggest that Zelis objected to Brown's testimony at the Merit Board hearing because he is African-American. Nor is there any evidence that Peterson considered race when he demoted his predecessor's Senior Deputies (including Brown) and replaced them with his own management team. And in his own deposition, Brown testified that he did not believe Peterson's decision to move him from the Mental Health Unit to the Juvenile Unit was based on race.

Lacking any actual evidence that these incidents were racially motivated, Brown appears to argue that a jury could *assume* they were racially motivated based on the few instances in which the record indicates the issue of race did come up during his 27-year tenure at the office. To be sure, facially neutral incidents are part of the totality of circumstances a court should consider in assessing a hostile work environment claim. But there must be a basis for inferring that the facially neutral incidents were in fact race-based. *Cf. Gutierrez v. Sodexo, Inc.*, 2014 WL 3725343, at *2 (N.D. Cal. July 24, 2014) (citing cases). And in this case, the incidents Brown identifies provide no basis for drawing such an inference.

First, Brown complains that MacMaster sent an email to a few colleagues with video files of Saturday Night Live digital shorts, and asserts that one of those videos ("I'm on a Boat") degraded African-Americans. But even if that could be considered an objectively reasonable interpretation of the digital short, MacMaster did not send it directly to Brown (indeed, Brown was out of the office on disability leave at the time). Second, Brown complains that Zelis stated she did not trust or like African American men, but he also testified that he did not believe Zelis's

6

1  distrust or dislike extended to him, and he further testified that they were friends at that time.
2  Third, Brown complains of MacMaster's "where da white women at" remark from 2002, which
3  was ten years before he filed his lawsuit.  These few incidents over a 27-year period, even viewed
4  in the most negative possible light, cannot support a conclusion that the other things that happened
5  to Brown during his tenure at the office (such as his transfer to the Juvenile Unit, MacMasters's
6  negative comments about his lawyering skills, or Zelis's comment that he went to the movies
7  during work hours) were grounded in racial hostility.  Therefore, a reasonable jury could not
8  conclude that Brown operated in a work environment in which racial hostility was so severe and
9  pervasive as to effectively alter the conditions of his employment.  *See, e.g., Manatt*, 339 F.3d at
10 799 (finding that two isolated incidents and other offhand remarks, which occurred over the course
11 of a year-and-a-half, although racially insensitive and offensive, did not give rise to a hostile work
12 environment claim); *Vasquez*, 307 F.3d at 884 (finding that harassing remarks made over a period
13 of more than one year, only two of which were racial in nature, did not create a hostile work
14 environment).  Finally, it bears repeating that, to make out a claim for racial harassment, a plaintiff
15 must present evidence not only that he was subjected to a racially hostile work environment from
16 an objective standpoint, but that he subjectively viewed himself as operating in such an
17 environment.  As discussed already, Brown has not presented evidence that could show from an
18 objective standpoint that he operated in a racially hostile work environment.  Moreover, Brown's
19 testimony, if anything, undermines the argument that he subjectively perceived himself as
20 operating in such an environment.  In addition to testifying that he was happy at the office, Brown
21 applied to be Peterson's Chief Deputy – the number two person in the office – after he filed this
22 lawsuit.  Asked about this in his deposition, Brown testified that he believes he could work
23 effectively with MacMaster and Zelis, which seems contrary to any subjective belief that he was
24 operating in a severely abusive work environment.

**CONCLUSION**

Because there is no evidence from which a reasonable jury could conclude that the defendants' conduct created a racially hostile working environment for Brown, the motion for summary judgment is granted.

7

**IT IS SO ORDERED**.

Dated:  December 15, 2014

_____
VINCE CHHABRIA
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID GLEN BROWN,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>CONTRA COSTA COUNTY, et al.,<br><br>　　　Defendants. | Case No. 12-cv-01923-VC<br><br>**CERTIFICATE OF SERVICE** |

　　　I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

　　　That on 12/15/2014, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

David Glen Brown
2254 Palmer Circle
Fairfield, CA 94534


Dated: 12/15/2014

　　　　　　　　　　　　　　　　　　　　Richard W. Wieking
　　　　　　　　　　　　　　　　　　　　Clerk, United States District Court

　　　　　　　　　　　　　　　　　　　　By:_____
　　　　　　　　　　　　　　　　　　　　Kristen Melen, Deputy Clerk to the
　　　　　　　　　　　　　　　　　　　　Honorable VINCE CHHABRIA

9